Good morning. Good morning, Your Honors. May it please the Court, my name is John Casperson. I'm here on behalf of Cashman Equipment Corporation. The case arises out of a dispute over a charty party for towing two barges from China to Louisiana. Dahl Tug & Barge, a Seattle company, provided the tug for the tow. Cashman Equipment Company needed the barges delivered to their facility in Amelia, Louisiana. The agreed rate was $6,000 a day. Cashman, paying a daily rate, assumed the risk of delay, by and large, but not all delays, and therein lies the rub. The charter required Dahl to prosecute the voyage with reasonable dispatch. This was obviously important to Cashman, as a 41-day delay would cost him almost a quarter of a million dollars. The barges were finally delivered on March 23, 2009, after many trials and tribulations, to Amelia. The charter called for a light return to Seattle. Notwithstanding the terms of the charter, the parties agreed that the tug would go off-hire for an undefined period of time. Mr. Dahl, the sole witness at trial for his company, testified that they went off-hire for three reasons. Those three reasons were incorporated into the Court's finding of fact. Number 10 reads as follows. With the consent of Cashman, Dahl took the Triton, the tug, off-hire on March 24, 2009. Dahl took the Triton off-hire to rest the crew, the first reason, to allow Cashman to inspect the vessel with an eye toward purchasing her, the second reason and the key reason that brings us here, and third, so that the vessel could undergo necessary repairs. Number two of those three reasons is the crucial point, to allow Cashman to inspect the tug. The record is perfectly clear on this point, and Dahl does not deny that Cashman's inspection did not finish until April 22, with Cashman notifying Dahl that they were satisfied with its condition on the very next day, April 23. Dahl did not respond for eight days, when on May 1, they asked Cashman to pick up some of the expenses of the boat during the intervening weeks. That proved to be a deal killer, and negotiations were over as of May 6, and Dahl's crew was told to leave, take the tug, and depart the Amelia facility the next day. Now Mr. Casperson, if I remember the dates correctly, the barge arrived, or the tug arrived, on March 23rd and went off-hire because the crew was tired, it had to be repaired, and Dahl agreed to give some time to Cashman to inspect the boat. So it went off-hire March 23rd. Judge Konauer found that the repairs were done and the ship was ready to go, not on April 10th when Dahl said they'd be ready, but on April 16th, after seeing what repairs were being done. Is it your position that he made an error of fact-finding at that point? No, Your Honor, not as to that point, but that was one reason, the repairs. The second reason that the Court listed was the inspection of the vessel so Cashman could determine if he was to purchase it. So, is it your position that as long as Mr. Cashman, or the Cashman Company, was claiming to be inspecting the vessel, there could be no hire? That is correct, unless one party or the other said, we're done. Well, isn't there some evidence that Dahl said, look, you've had enough time to inspect the vessel, this vessel's going to be ready to go on April 10th, and we're going to go back on hire April 10th? Isn't there some evidence of that? He did say that in an email. In fact, that is not what happened. That was part of this ongoing... Whether it's what happened or whether it isn't what happened, there's some evidence that it was going to go back on hire April 10th, and then Judge Kohenauer said, well, it couldn't go back on April 10th because it wasn't repaired until April 16th. So, he didn't take the April 10th date of Mr. Dahl as biblical truth. Fine. My question to you then, based on our rule in the Ninth Circuit regarding review of fact and evidence, is that Judge Kohenauer abusing his discretion in finding that the ship was ready to go on April 16th, and if so, tell me why. Your Honor, that is exactly our position, and our position is that when you look and consider the record as a whole, it was very clear that what was happening there was that Mr. Dahl was engaging in the typical puffing negotiation that you would expect the parties to engage in, and they were engaging in as they were attempting to negotiate a price for the vessel. That is what was taking place, nothing more, nothing less. And you can look at Mr. Dahl's email that was sent on April 16th. Well, what you're saying now is that Judge Kohenauer may have been right that the ship was ready to go on April 16th, but where he made his error was in not properly evaluating the testimony as to whether Dahl had extended the period of no hire beyond April 16th because negotiations regarding the purchase were still going on. Is that right? Close, Your Honor. The other thing that was still going on was that the inspection of the vessel was not complete. Cashman had not yet... Cashman's inspection of the vessel, not Dahl's inspection of the vessel for purposes of necessary repairs. Cashman's inspection of the vessel. Correct. Well, is there anything that contradicted that email? I mean, did Riddle ever tell Dahl April 10th is an unacceptable date and there's some kind of problem? The emails go back and forth as the parties are engaging in this process of negotiation that's going on. The April 16th email from Mr. Dahl to Mr. Riddle on behalf of Cashman the very day when supposedly this thing was all done didn't say we're back on hire, and Mr. Dahl admitted at trial that he never told them that. What he did say was, you guys need to start picking up the expenses of the crew and the insurance going forward from this point if you're going to continue this process. And after that, did Mr. Riddle say anything? Is there any testimony or email? As to just... Responding to that April 16th email? Just a further, the next report was, we've now finished our dry docking, we're ready to close, we'd like to buy the boat on April 23rd. But that's the only response to that email? Yes. Okay. Now, after this process and this negotiation eventually came to a screeching halt on May 6th, then the next question was, what happens? And getting back to the abuse of discretion, does Kohenauer abuse his discretion in facts finding as to what the objective manifestations of the parties were as to the proper suspension of hire period? In what way? The parties agreed that the boat would go off hire for three reasons. The key reason that we're focusing on here... Was the inspection of purchase. Correct. But you agree that just because a buyer says, I'd like to inspect the ship, it doesn't mean a hire period is indefinitely postponed to the convenience, even the lassitude of the buyer. Certainly, Your Honor. And had Mr. Dahl affirmatively said, we're back on hire, I'm not going to do this deal on these terms anymore, then we'd have a completely different situation. He never did. Oh, I see. Your position is, as long as Mr. Dahl doesn't say, you've only got until this date to make up your mind, and then we go back on hire, the hire period is extended by implicit mutual agreement. Precisely right, Your Honor. And Mr. Dahl admitted at trial that he never told them anything of the sort. Rather, they went back and forth. The process continued until finally, Cashman completed its inspection, said, we're ready to close the deal. And at that point, Dahl injected new terms into the deal, and the thing fell apart. Well, pardon me if I want to stick to this point, but what facts did Judge Kohenhauer misinterpret in determining that there was no indefinite period of no hire because of the implied mutual agreement? It was indefinite, Your Honor, until one of the parties, either party, could have said, we're done negotiating the terms here. All right. So what facts did he misinterpret? It really was an absence because Cashman nor Dahl said, we're done negotiating here. The deal is off. We're going to go back on hire at this point. That never happened. It simply didn't. The parties continued down this path. They'd begun. The negotiations were going back and forth until finally, two weeks later, when the thing had finally fallen apart and Dahl's counsel said to Cashman, Mr. Riddle, well, take our terms or we're going to go back on hire as of April 14th. Well, it's always a difficult thing to climb over a district court's finding, as you know, but the standard that we're given is that those findings be illogical, implausible, or without support in the record, and what you're positing seems to me to be an alternative, but not necessarily one that makes Judge Kohenhauer's findings illogical or implausible. Would you comment on that? Our view is that they are implausible. Illogical, I wouldn't say that, but they're implausible based on the evidence that was presented at trial in Mr. Dahl's testimony. It's difficult for me to understand how the court could say and found that the parties agreed that they were off hire for purposes of concluding these negotiations if they were going to get anywhere. I think that part's pretty clearly understood, but what's implausible based on the record is that Dahl could say two weeks later, oh, you know what? You didn't agree to the terms. We're back on hire as of two weeks prior. Why is it implausible that the owner, let's say, of an apartment who has a tenant who may want to buy the apartment says, while you're making up your mind, you're paying rent? Isn't that what's happening here? No, Your Honor, because that's not what he said, and had he said that, then Cashman would have been in a position to say, okay, I get it. Either we'll discontinue the negotiations and take the boat and head to Seattle, or we'll see if we can negotiate some other terms. That never happened. Rather, Cashman was lulled into this situation. Nothing happened in the interim that suggested that they should be on their guard. Dahl did not say, we're back on hire. Didn't Fred Dahl send emails in early April to your client saying that the vessel would be back on hire when the repairs were complete? You start with a yes or no. Yes, he did say that. Okay. He did say that. But when you look at the process and the context of everything that took place here, I think it's pretty clear that that was, if you will, negotiation. He said the crew was going to be back on April 10. Did Fred Dahl ever say, I've changed my mind, I don't think it should be back on hire when the repairs are done? I think he said exactly that when he said, you need to pay the expenses in the interim. Those expenses would have been for Dahl's account had the vessel been on What else is somebody supposed to conclude when somebody says, would you pay some of these expenses that would normally be part of that charter hire? Of course, you understand what's happening here. They're just negotiating a little bit as we try to figure the fine points of the deal. And that's what took place here. So you say that the communication by Dahl saying you need to pay the expenses in the on hire on April 10th, because if you went back on hire, you wouldn't be able to get both the hire and the expenses. Well, look at what was happening on April 10th. There was no crew. France was yes to that. I'm sorry. I didn't understand the question. Oh, pardon me. You're saying that in answer to Judge Hawkins' question, you're admitting that the period of suspension of hire is over when the boat is repaired, when the ship is repaired. And then later you said, yes, but that is inconsistent, as I understood you to say, with Dahl's statement. You're going to have to pay the expenses while you're deciding whether to buy the boat. The paying the expenses during that period of time is inconsistent with paying the hire because the hire includes the expenses. Correct. So you say that that was a revocation of his term of saying we go back on hire on April 10th. No, Your Honor, what I would say is that if you look at the totality of the circumstances and what was happening between the parties, both in their communications as well as on the ground with the vessel and what was happening with the crew or not happening with the crew, the repairs that were taking place, is that there was a lot of noise out there, but at no point did Cashman get the word from Dahl that they are done with the negotiations and the vessel is back on hire. That's the point I'm trying to make. You want to reserve your remaining time? Thank you, Your Honor. May it please the Court, I'm Terry McGee and I represent the plaintiff at Pelley, Dahl, Tug and Barge. This point wasn't discussed at all in the argument by Mr. Casperson, but I think one of the points on which I may be able to be useful here is on this point. This is an area of law in which, in my experience, it's very easy commentators and truth be told even courts start using terms a little bit casually and one of the ways they use them casually is here and there are three cases cited in Cashman's brief that say the owner has the burden of proving seaworthiness and I'd just like to urge that those cases need to be looked at with some care. The Tug Ocean Prince case is not a charter party dispute. In that case, the owner was acting as under Supplemental Rule F, under the Limitation of Liability Act, seeking to limit his liability for the grounding of the tow. Mr. McGee, as I understood Mr. Casperson's argument, I mean my notes are wrong, but he was not having any problem with Judge Kohnauer's decision that the ship had its necessary repairs and was okay to undergo on April 16th. So it was seaworthy as of that date? He didn't hear, Your Honor, but in his briefs he does. One of the arguments is that the vessel was unseaworthy while she lay in Amelia. We didn't hear any word about that, Mr. Casperson. I agree. Why don't you address what Mr. Casperson was arguing? Okay. Thank you, Your Honor. What he's basically saying is you throw out an email, it's like sending it into space, nothing else happens, and that that can't basically change the landscape. Well, what happened here, and Judge Hawkins pointed out that on April 3, Mr. Dahl sent an email saying we're going to be ready to go on April 10. I'm making arrangements to get my crew back on. We're going to be ready to go. And this will go back on hire. And we'll go back on hire, and I believe he even mentions the $6,000 a day number. We're going to be ready to go back on hire on that date. He came again on the 7th of April and said something to the same effect. We're going to be ready to go, and we're going to be back on hire. Two times he says we're back on hire. As of April 10th? As of April 10th. And then events continue, and the record has got all these exchanges of emails where Cashman is saying, well, we can't get her into dry dock until this time. We've got to move back closing, because his response earlier had been, well, we're looking to close about the 15th or the 16th, something like that. Of April. Of April. So Dahl and Easter intervened. So Dahl held his crew back up here. Right. And then they come along, and pretty soon Cashman's Mr. Riddle is saying, well, now it's going to be the 23rd. In the meantime, we'll come up to the 16th. And he says, OK, we're ready to go on the 23rd or so. And this is after an eight-day communications blackout. And Mr. Dahl responds in his email with words to the effect. It's a little late. I've already got my crew on the airplane yesterday. They're on the way down there. So they were there and aboard on the 16th. Now, Mr. Casperson says, well, OK, but later on, look at the emails. He's asking for crew expenses. He's asking for help on paying the insurance. I think if the court looks at those emails, every one of those exchanges, and some of them came from me, and some of them came from Mr. Dahl, if I recall correctly, they were all in the context of this. If you're going to buy the boat, since you've taken so long to get this done, you've got to help us out with helping on the payment of crew expenses and insurance. But that's double charging, isn't it? No, Your Honor. If you're getting hire from April 16th, you don't also get crew expenses and insurance and bananas. And absolutely, Your Honor, and especially not bananas. But what Dahl was saying, and I think a fair reading of his emails is this. If you buy the boat, we'll waive hire. Where is there anything in Dahl's communications that says, if you buy the boat, we will waive hire retroactively? I think that's the fair reading of it. Oh, that's an implied term. That's an implied meaning, an implied statement by Mr. Dahl. I think so, Your Honor. And then, in fact, in one of my emails, I think it's May 1, I say, okay, this is what we'll do. And I have to say, Dahl never changed up the terms. If you read the emails, they had never reached an agreement because Cashman wanted to do this on a, instead of all cash down, they wanted to make payments over a series of months. They had never come to any agreement. But on my email of May 1, I said, well, we need this and this. And otherwise, we will have been on hire since April 14. In other words, if you don't buy the boat, we've been on hire. If you do buy the boat, we're just looking for help on the insurance and the crew. And that was, I think it's a fair reading of the emails. And I think that was understood by everybody that that's what Dahl was saying. If you buy the boat, I'll eat the hire, but I want you to help me on the crew expenses and insurance. But if you don't buy the boat, we've been on hire like I told you we were since I've had my crew aboard. Now, your position is that these statements, full of implied statements, kind of a contradiction in terms, as to the objective manifestations of the parties, were facts to be found by the trier of fact, Judge Kohlenhauer? Yes, Your Honor. As long as the evidence does not render them illogical, implausible, or without support in the record, we should simply affirm those factual findings. That's correct, Your Honor. And I would point out that the position taken by Cashman at trial was that the parties had actually entered into a bilateral modification of the charter to the effect that the vessel would stay off hire until Cashman was done, however long it took with its inspections. And Judge Kohlenhauer, to speak softly, did not credit the testimony of Cashman's witness on that point, found that he was completely non-credible and said so in no uncertain terms. And that's why we're here now talking about another theory that was presented to Judge Kohlenhauer. Well, we haven't really talked about the email that preceded the Dahl April 10 date, where Riddle basically says, it's Ray the offer to end the charter. And it looks there like he's talking about two things. One, charter going back on. He says, are you sure you're going to be ready by the 10th? I don't want to get the toe up there and have this happen. You're not ready to go and the repairs aren't done. So when will the crew be arriving? And then he says in a separate paragraph, well, I'm also interested in buying the vessel. So I take it this is confirmation that they're really proceeding down two parallel tracks in a way? Yes, Judge McKeown, that's what I believe. That's one of the reasons I think that's the fair reading of these email exchanges is that it's clear all along they're saying, okay, we're on here on a purchase and sale track. Over here, we're on the track. Now we're talking about what happens if we don't buy the boat. And they're trying to say, well, you can, we'll give you a lump sum. And Dahl had offered to take a lump sum, but they never agreed on what that lump sum was. Is the lump sum part of the purchase or is that a lump sum? Is that part of the purchase lump sum? The $200,000 or is that's a charter lump sum? It was going to be a lump sum. So we can get going, get back to Seattle, get some other deals going? Yes, Your Honor. And thus, okay, it no longer matters how many days you take. And of course, Dahl would have been free then to say, I'm going to find another tow here. I put the $200,000 in my pocket. I'm going to look around and see if I can find another tow because everybody recognizes it's kind of a waste of a resource to have a tugboat sitting in Louisiana who's got to come to Seattle for her to come back without a tow. So both Cashman was looking for a tow. And if you see the emails that started as early as when they were in Panama. Is there any claim made that you failed to mitigate damages by finding another tow? They have not made that claim, Your Honor. I think it's fair to say that would have been a defense if we had not been looking for another tow. The claim now made is that we spent too much time looking for another tow instead of just getting out of town. And I've briefed that. I'm happy with the briefing on that point. But I think we were entitled. We waived higher for an indefinite amount of time. But indefinite doesn't mean unlimited. And Judge Bea, you made that point. It doesn't mean forever at the pure pleasure of Cashman. And with notice starting on April 3, as Judge Hawkins pointed out, and then again on April 7, Dahl said, we're going to be ready to go back on higher on the 10th. He then acquiesced to the 16th. And we, in fact, at trial, we conceded to Judge Kuhnauer that the earliest date on which we had the crew back was the 16th and that that was the earliest date on which we could claim to go back on higher. He says he's ready to go on the 17th, basically. Ready to go on the 17th and, of course, having the crew back. Having everybody back and available and putting it together to go. That's right. And, of course, it's not like getting in the rental car. It hurts turning the key and driving out. You've got to fuel. You've got to get fresh water. You've got to get groceries. What effect, as to your readiness, did the hiring away of your captain have to do? The record shows that Mr. Dahl came back down on May 18. He flew back down to Amelia for the purpose of getting the groceries, getting, you know, attending to all the things, among which were getting the chain bridles off the boat that belonged to Cashman. By the way, the chain bridles are a different thing than the broken drive chain, which in their brief, they say this is a $1,000 item. A drive chain is a glorified bicycle chain that drives, that helps drive the winch. The chain bridles are these big things that attach from the barge to the tow wire, and each one of those links is maybe 14 inches long and 2 1⁄2 inches thick. We're talking about 5,100 pounds each. That's not the same thing as the drive chain on the winch. So Captain Dahl came back on the 18th, because they thought they were within a couple of days of being able to go. He attended to getting the tow pin on. They finally had their first access to where they could get close enough. What delayed the ship from sailing from April 16th until May 18th? The work buttoning up on the invasive inspection that was done by Cashman, because they'd been in the tanks. They'd opened things up. They took a tow pin off and had it repaired. They had the broken drive chain on the winch replaced or repaired. I think it was replaced. Most significantly, they had on the tug two of these chain bridles that belonged to Cashman. They could not get them off or the new tow pin on, because at Cashman's facility, they couldn't get close enough to the shore so that any crane could reach them. So they finally were able to do that on or about the 19th of May. And the issue of whether this delay from April through May was due to Cashman or due to Dahl was litigated in front of Judge Kovner? That was litigated fiercely. And of course, the trial court's determination was based on the Charter Party, which says that periods of interruptions in service, they have to be solely Dahl's fault or you stay on hire. And that's the contract negotiated by the parties. And he found that he could not find that any of these delays were solely Dahl's fault. I know my time has expired, but if I can answer Judge Boyer's question. Please do. The hiring of the captain, and he said, see you later. As Mr. Dahl got to the boat, the captain walked off. That did delay them from that point until the 27th. So it probably added, I don't know if you could say all of that time was due to that, but it added at least several days, because they had to find a new captain, fly a new, they fleeted the mate up to captain, flew in a new mate to replace the guy who had been the mate. Thank you. Thank you. You have 37 seconds, which won't do you any good. So let me, please add a minute to the clock. Thank you, Your Honor. Let me pick up with a point that came up initially with Mr. McGee. The fact that repairs were complete by no means meant that the vessel was seaworthy. At that point, crew was still necessary to be brought down, and it was pretty clear the crew that was brought down was not crew that was brought down to put the boat back to sea. They brought crew down simply to provide the ability to move the boat around while it was in the yard, while they were doing their inspections. That's what was going on. The crew to take the boat back to Seattle was not there, and that was not the crew that showed up on April 16th. Does your client have any quarrel with the period from May 27 to June 20? No, Your Honor. Have you ever offered to pay that? Your Honor, that has not been paid. So the crew that they brought down was deficient, was insufficient, and not a crew that was going to get the boat back to Seattle. So it was still unseaworthy at that point. Certainly, the vessel remains under the control of... I see my time is up. I thank the court for their attention. There are quite many questions. Thank you very much. Thank you very much. I'd like to thank both counsel for your argument this morning. Dahl Tugg versus Cashman Equipment is submitted. We'll take a short break, and the last case for argument is Pimentel versus Dreyfus. If you can go ahead and get set up. Thank you.
judges: Hawkins, McKeown, Bea